At the same time as in the preceding case, and at the same Court of Oyer and Terminer, William Lowber, *Page 325 
negro, was also separately indicted and tried for the murder of Thomas Hogan, of the first degree, on the same day and year aforesaid.
On cross-examination, however, he admitted that he had told Mr. J. Stewart that it was himself, and not Bill Lowber, who went with the peddler up to Mrs. Wootter's house that morning, and also that he had told Mr. John Jester that it was not Bill Lowber, but Jim West and himself who killed the peddler.
Henry Whitaker testified that he lived and kept store near Frederica on the road to Kersey's mill, and about 8 o'clock in the morning of the 19th of last March, Thomas Hogan, the peddler, came into his store and enquired where John Young lived, and a short time before he came in the saw a negro man whom he took to be William Lowber, pass his store walking in the direction of Kersey's mill. That he gave him the information asked for and in a very few moments he left, and having occasion soon afterwards *Page 327 
to step out of the store himself, he looked up the road and saw them going up the road, but Lowber a little ahead of Hogan.
Alexander Young testified that he was at work that morning putting up a fence along the road about a hundred yards beyond Mr. Whitaker's store and saw the prisoner pass up the road, and afterwards the peddler about a half a mile behind him, and that it was about 8 o'clock when the latter passed him.
James McQueen testified that he lived this side of Fredericka, and that the deceased spent the night before he was killed at his house, and left it the next morning between 6 and 7 o'clock, and he saw him again that morning between 8 and 9 o'clock going towards Kersey's mill, and that the prisoner was then with him, and they were walking along the road together side and side, that he stopped and talked with the deceased for a few moments, when the prisoner kept on for a short distance, and then stopped in the road and waited for the deceased, and that they were then a mile beyond Mr. Whitaker's store towards Kersey's mill.
Sarah Ann Morris testified that she lives on the road from Fredericka to Kersey's mill, a mile and a half from the former and a half mile from the latter place. On the morning of the 19th of March last William Lowber and the peddler came up the road together as far as her house between 8 and 9 o'clock, and the peddler stopped and came in, the prisoner did not, but kept on up the road. Edward Darnell was then there, and the peddler showed a soldier's coat to him and wished to sell it to him, but did not, she however bought some articles of him, and he gave her the right change all to five cents. Soon afterwards the peddler went away from her house alone and up the road towards Kersey's mill, and after a bit stepping out of the house and looking up the road, she saw him going into Kersey's *Page 328 
house, but saw the prisoner nowhere then or again that day. Soon after that Edward Darnell left her house and went up the road in the same direction and towards his uncle John Young's house, and was away until about twenty-five minutes of 12 o'clock, when he came back and ate his breakfast. Jim West was at her house at that time and took a dinner from there to a man who was working out in the woods some distance from her house, at twenty-five minutes before twelve o'clock and that Jim West was cutting wood at her house when the peddler came there, and was about there all that morning. She did not know why Edward Darnell went after the peddler from her house. She did not send him after the peddler for any thing. He was no relation of hers, but her mother had raised him, and he had been living at her house since last June, and Jim West boarded there all last winter. Two other colored women who were at her house during the period of that day spoken of by her, confirmed her statements, one of whom testified that the peddler came there a few minutes after the clock had struck eight that morning.
Thomas J. Young, a negro boy nine years old, testified that he lived at John Young's his grandfather's, on the road from Fredericka to Kersey's mill, and not far from the mill, and that it was the third house on the road from Sally Ann Morris' going towards the mill. That he saw the peddler at their house about 10 o'clock that morning, he saw him come along the road and stop there and saw William Lowber about the same time pass by their house on the road, but he did not stop, but kept right on, and soon after that Edward Darnell came to their house, but William Lowber was not with the peddler or Edward Darnell, or at their house when either of them came there.
Margaret A. E. Benning testified that she lives at Kersey's mill, and lived there on the 19th of last March, and saw the peddler at their house that morning, and it then wanted five minutes of 10 o'clock, and soon after he left *Page 329 
there and she went into the house, she saw two colored persons whom she did not then know, but whom she now recognized and identified as William Lowber and Edward Darnell, pass along the road in the same direction, and not far behind him, and when she last saw them the peddler was passing over the bridge of the dam and they were not more than fifty yards behind him. She was not more than five steps from the road when they walked past, and as they came towards her she could see their faces distinctly.
Matilda Wootters testified that she lived at the end of Kersey's mill dam and next neighbor to the preceding witness. The peddler came to their house that morning about 10 o'clock she supposed, and first inquired if she had any lamps like the one he held in his hand that she wanted to sell, she told him she had not, and he then enquired if they had any muskrat skins to sell, and she answered no. He had left his pack and satchel at the yard gate when he came through it, and as soon as he left the house she stepped to one of the front windows and then saw a negro man whom she did not know, but now recognizes and identifies as the prisoner, standing outside of the gate waiting for him, they then went away from there together up the road towards her father's house, and about fifteen minutes afterwards she saw the same two men coming from the pine patch and across his field towards the Canterbury road. The colored man had on a soldier's light blue overcoat, and which she also identified as the same which the prisoner then had on. Two other women who were then at the house of the witness in their testimony corroborated her statement and stated further that it was then about 10 o'clock in the morning when the peddler came there; but both of them on cross-examination admitted that they were witnesses for the State in the hearing of the prisoner's case on the writ of habeas corpus before Judge Houston, and that they were not then able to identify him. *Page 330 
James Wilkins testified that he saw the peddler that morning and a tall colored man with a heavy beard and mustache, between 9 and 10 o'clock, on the road together near Sally Ann Morris', and now recognized and identified the colored man as the prisoner.
Samuel W. Darby, the first witness called on behalf of the prisoner, testified that he saw him going into the town of Frederica about 6 o'clock in the morning of the 19th of March last, and William E. Knowles of the same place, that he sold him as early as 7 o'clock that morning, a dose of medicine on a prescription which he brought from Dr. Cahall, and Robert Parkinson that he saw him going into Frederica about 6 o'clock and afterwards going out of it about half-past 7 o'clock that morning; that he was at his shop when he saw him pass it going out and spoke to him, and that his shop is a mile and a half from Sally Ann Morris' house, and Samuel Townsend that he met him on the road that morning between half-past 7 and 8 o'clock about a mile from Fredericka going towards Kersey's mill, and the peddler about a half a mile behind him going in the same direction. Henry Carter testified that he saw the peddler going into John Young's house that morning about half-past 9 o'clock, and Edward Darnell also going in there a few steps behind him, but he did not see any body else, and he saw them again on his way back from the mill about fifteen minutes afterwards, the peddler within an eighth of a mile of the mill, and Darnell about seventy-five yards behind him, James H. Beauchamp testified that he met the peddler that morning between 9 and 10 o'clock, on Kersey's mill dam about midway of it, and about two hundred yards from Mrs. Benning's house, and a colored man with him whom he did not know; but he knew William Lowber very well, and it was not him. Cæsar Beauchamp also testified that between half-past 10 and 11 o'clock that morning he was going along the path through the pines near where the body was found in the mill pond, and saw the peddler *Page 331 
buttoning up his clothes a short distance from it in the pines and Edward Darnell standing in the path not far from him; but he did not see William Lowber, or any other person near there. He knew it was as late as half-past 10 o'clock when he left his house to go to the mill that way. It was also proved by various witnesses that it was a mile and a half from the place of the murder to the prisoner's house, and not less than seven miles from there to the town of Lebanon by way of his house, and that he was at his home at half-past 9 o'clock and geared and hitched his horses to his wagon and drove off on the road leading towards Lebanon, and was there by about 11 o'clock that morning. He also proved by several of the most respectable citizens residing in that section of the county, that his character for peace and good order had always been remarkably good for a man of his race, and void of all suspicion whatever until this accusation had been brought against him.
that the prisoner was to be presumed to be innocent of the charge until his guilt had been proved and established by competent and credible testimony to the satisfaction of the jury beyond a reasonable doubt. The factum or corpus of the crime, that is to say, the killing of Thomas Hogan as alleged in the indictment against the prisoner, was supported by the testimony of one witness only, Edward Darnell, who had himself been convicted at the present term of the Court of the crime of murdering him, and upon his confession that he was an accomplice and participated in the murder of him. He was admitted as a competent witness on behalf of the State, and against the prisoner in this case on the special application of the Attorney General for a writ of habeas corpus ad testificandum to the sheriff of the county, for the production of him out of the common jail, in which he then was, and still is, imprisoned after his conviction of the crime, awaiting the sentence of the Court upon it, as a witness for the *Page 332 
State in this case, and under the provision of the act of the General Assembly entitled "An Act in reference to to the competency of certain persons as witnesses," passed at Dover, February 18, 1859, which is as follows: "Sec. 3. That no person shall be excluded from testifying as a witness by reason of his having been convicted of a felony, but evidence of the fact may be given to affect his credibility." Del.Laws. 11 vol. 686; but which while it removed any exclusion which might then without the statute have prevented him from being a witness in the case, still leaves the fact of his conviction to affect his credibility as such, and which leaves the jury to judge of the weight and worth of his testimony with such a taint cast upon it. But in addition to this inherent defect in the character and credibility of it, his testimony against the prisoner was still further weakened and impaired by the contradictory declarations and statements made by him before his trial, and which he admitted on his cross-examination as a witness in this case, he had made to Mr. J. Stewart, that it was he himself, and not Bill Lowber, the prisoner, who went with Hogan, the peddler, up to Mrs. Wootters' house, and which he made at another time to Mr. John Jester, that it was not Bill Lowber, but Jim West and himself who killed the peddler. His testimony was also further weakened and impaired in its weight and credibility, by the inconsistent and contradictory testimony of other witnesses on several material and important points which would readily occur to the jury when they come to consider and compare them with his testimony, as well as by the fact which clearly appeared from the testimony of others that the prisoner could not have been at or near the place of the murder at the time when it was committed that morning So far then as it connects the prisoner with the commission of it, his testimony not only stands alone without any direct evidence from any other witness to corroborate or support it, but it is, on the contrary, directly contradicted by his own declarations made after his arrest and before his trial, and *Page 333 
by the testimony of other witnesses in several very important particulars. The Court therefore in accordance with the general practice in relation to the testimony of accomplices in cases of murder and other felonies, would advise the jury that they ought not to convict the prisoner on the testimony of the witness, Edward Darnell alone, without corroboration to satisfy them beyond any reasonable doubt that the prisoner was a particeps criminis with him in the perpetration of the crime alleged, or that the prisoner participated with him in the killing of Thomas Hogan, as sworn to by him, notwithstanding the fact that he had himself already been tried and convicted of the crime of murdering him before he was admitted to testify as a witness in this case, for by his own statement he appeared and was produced and testified here as an alleged accomplice with the prisoner in the commission of the crime, although his credibility for that reason may not be affected to the same degree, as it might have been, if he had been called as an accomplice to testify in this case prior to his trial and conviction for the murder of the deceased.
Independent of his testimony the evidence in the case is entirely circumstantial, and in which there were marked discrepancies in the statements of the witnesses as to the time of day when the prisoner was last seen that morning in company with the deceased, or with him nearest to the place where the murder was committed, and which was a matter of great importance in the consideration of the case, as he was proved to have reached his home, a considerable distance from there, before the murder could have been committed according to the testimony of some of the most intelligent and reliable witnesses who had testified on such points in the case. But there is a marked distinction and difference between circumstantial evidence in civil and in criminal cases at law. In civil cases it is not necessary that the minds of the jurors shall be free from all doubt as to its sufficiency to prove the fact or matter in dispute, for it is their duty in such cases to *Page 334 
decide in favor of the party in whose favor the weight of such evidence preponderates, and according to the reasonable probability of its truth; on the contrary, in criminal cases the jurors are required to be satisfied beyond any reasonable doubt, of the guilt of the accused, or it is their duty to acquit him, the charge not being proved by that higher degree of evidence which the law in such cases demands. In civil cases it is sufficient, if the evidence on the whole agrees with and supports the hypothesis which it is adduced to prove; but in criminal cases it must exclude every other presumable hypothesis but that of the guilt of the accused. Because in criminal cases, and particularly in a prosecution for a capital crime, the law presumes the accused to be innocent, or not guilty of it, until the commission of the act by him has been proved by the evidence to the satisfaction of the jury beyond a reasonable doubt.
 Verdict "not guilty."